UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GERALD GELDZAHLER,                              :

                                   Plaintiff,   :

        -v-                                     :

NEW YORK MEDICAL COLLEGE, DR.                   :
JOSEPH MORALES, AND DR. JAY P.                  :
GOLDSMITH,                                      :
                                                :
                                  Defendants.   :
-------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 9/30/10

OPINION AND ORDER

09 Civ. 1791 (JLC)

Non-ECF Case

**JAMES L. COTT, United States Magistrate Judge.**

**I.      INTRODUCTION**

        Pro se plaintiff Dr. Gerald Geldzahler ("Plaintiff" or "Dr. Geldzahler") brings this

action against New York Medical College ("NYMC"), Dr. Joseph Morales, and Dr. Jay

P. Goldsmith (collectively, "Defendants") (Doc. No. 1).  This Court has diversity

jurisdiction over the subject matter of this case.  Complaint at Section II (Doc. No. 1);

Answer at ¶ 3 (Doc. No. 21).  After the parties consented to a magistrate judge

conducting all proceedings pursuant to 28 U.S.C. § 636(c) (Doc. No. 14), Magistrate

Judge Peck granted Defendants' motion to dismiss as to Dr. Geldzahler's breach of

contract and wrongful discharge claims but denied it as to his claims under New York

Labor Law §§ 740 and 741 in a published decision, familiarity with which is assumed.

Geldzahler v. New York Med. Coll., 663 F. Supp. 2d 379 (S.D.N.Y. 2009).  This case

was reassigned to me on March 12, 2010 (Doc. No. 35), and before this Court is

Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure (Doc. No. 31).

USDC SDNY
DATE SCANNED  9/30/10

1

For the reasons discussed below, summary judgment is appropriate on both Dr. Geldzahler's Section 740 and Section 741 claims.  The Section 740 claims are time-barred to the extent they are based on his April, 2007 termination as NYMC Program Director, and he does not fit the statutory definition of an "employee" with respect to his claim related to the non-renewal of his NYMC faculty appointment.

As for Dr. Geldzahler's Section 741 claims, they should be dismissed as to Dr. Goldsmith because Dr. Geldzahler was not an "employee" at the time his faculty position was not renewed, as required by the statute.  Moreover, they should be dismissed as to Dr. Morales because he was not an "employer" as defined in Section 741, and thus there is no individual liability.  Finally, summary judgment should be granted to NYMC because there are no disputed facts as to NYMC's defense that it terminated Plaintiff as Program Director and did not renew his faculty appointment for reasons other than his alleged whistleblowing.

## II.     FACTUAL BACKGROUND

The facts that are undisputed or, where disputed and supported by competent evidence, taken in a manner most favorable to Dr. Geldzahler, are as follows.[1]

---

[1] Dr. Geldzahler's opposition papers consist of (1) Local Civil Rule 56.1 Statement Response, along with a Geldzahler Declaration attaching exhibits ("56.1 Response") (Doc. No. 36), (2) Declaration of Gerald Geldzahler dated March 8, 2010 with attached exhibits ("Geldzahler Declaration") (Doc. No. 40), and (3) Declaration of Dr. Kendall Sims dated March 5, 2010 ("Sims Declaration") (Doc. No. 37).  Dr. Geldzahler's 56.1 Response contains assertions of fact that do not cite to evidence, and the Geldzahler Declaration contains inadmissible evidence in the form of conclusory statements lacking evidentiary support, legal arguments, and hearsay statements.  There are also unsworn statements within Geldzahler's 56.1 Response that are not contained in the Geldzahler Declaration, which raise issues of material fact.  Local Rule 56.1(d) requires that, in a 56.1 Statement, each material fact asserted by the movant and opponent must be followed by citation to admissible evidence.  Local Rule 56.1(d).  Dr. Geldzahler

NYMC is a private health science university that has been chartered by the

Regents of the State of New York.  Local Civil Rule 56.1 Statement ("56.1 Statement") ¶

6, Ex D (Declaration of Joseph Morales dated February 8, 2010 ("Morales Decl"), ¶ 3).

NYMC has a Department of Dental Medicine and, accordingly, has been accredited by

the Commission on Dental Accreditation ("CODA") of the American Dental Association

("ADA").  Id.  As part of the educational training for NYMC residents, NYMC has

affiliation contract arrangements with Metropolitan Hospital Center ("MET") and

---

also received a notice pursuant to Local Rule 56.2 ("56.2 Notice"), informing him that
assertions of material facts must cite to evidence and that witness statements must be in
the form of affidavits (Doc. No. 33).

"A district court has broad discretion to determine whether to overlook a party's
failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73
(2d Cir. 2001).  However, a pro se litigant's "'bald assertion,' completely unsupported by
evidence, is not sufficient to overcome a motion for summary judgment." Lee v.
Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting Carey v. Crescenzi, 923 F.2d
18, 21 (2d Cir. 1991)).  Because Dr. Geldzahler is proceeding pro se, this Court has
conducted "an assiduous review of the record" to determine if there is any evidentiary
support for his assertions of fact that do not cite to evidence and to determine if there are
any other material issues of fact.  Id.  Also, despite Dr. Geldzahler's having received the
56.2 Notice, we take into account his status as a pro se litigant and will consider the
unsworn statements in his 56.1 Response on the assumption that he would have testified
to these statements in his Declaration.  See, e.g., Shah v. Kuwait Airways Corp., 653 F.
Supp. 2d 499, 506 (S.D.N.Y. 2009) (considering pro se litigant's unsworn statements
assuming litigant would be given opportunity to submit proper affidavit), vacated on
other grounds, No. 09 4734 CV, 2010 WL 26979960 (2d Cir. 2010).  We have not
considered the Sims Declaration, however.  Dr. Sims was not an individual who was
listed in Dr. Geldzahler's Rule 26(a)(1) disclosures, nor was he identified as a person
with knowledge in response to Defendants' interrogatories.  Reply Declaration of Kevin
J. Smith dated March 15, 2010 ("Smith Decl."), Exs. B & D.  At a conference with
Magistrate Judge Peck on November 19, 2009, Dr. Geldzahler was told that a failure to
submit a comprehensive Rule 26(a)(1) disclosure would result in his being barred from
using information from any undisclosed sources, such as Dr. Sims.  Id., Ex. A at 9:23 –
10:8.  Plaintiff has not offered any explanation for his failure to identify Dr. Sims until
now.  In any event, the information offered by Dr. Sims is not relevant to the issues the
Court addresses in resolving the pending motion.

3

Westchester Medical Center ("WMC") that allow NYMC residents to work at both facilities. Id. ¶ 2. One of the educational residency programs offered by NYMC is the Oral and Maxillofacial Surgery ("OMS") residency program, which has a Program Director and Site Directors at MET and WMC. Id. ¶¶ 4-5. OMS residents work in both the Dental Clinic and the Operating Room at MET. Id. ¶ 2.

The Dental Clinic at MET is regulated by the New York State Department of Health. 56.1 Statement ¶10. The Department of Health issues operating licenses to hospital facilities, including MET, and sets standards of patient care and safety. 56.1 Statement ¶ 18, Ex. G.; N.Y. Public Health Law § 2805 (McKinney 2010).

The OMS residency program must comply with the Accreditation Standards for Advanced Specialty Education Programs in Oral and Maxillofacial Surgery issued by CODA ("CODA Standards"). 56.1 Statement ¶ 16, Ex. B (Geldzahler Dep. at 25:5 – 25:16; 31:7 – 33:6). Neither CODA nor the ADA are government agencies, although CODA is recognized by the U.S. Department of Education as a national accrediting body for dental and dental-related education programs conducted at the post-secondary level. 56.1 Statement ¶ 14, Ex. H (CODA Introduction, http://ada.org/prof/ed/accred/commission/index.asp); see also American Dental Association – Commission on Dental Accreditation, http://www.ada.org/117.aspx (last visited Sept. 29, 2010). Limited permits, which are issued to first-year OMS residents and sometimes to more senior residents, are regulated by the New York Department of

Education. N.Y. Educ. Law § 6605; N.Y. Comp. of Codes, R. and Regs. tit. 8 § 61.3; 56.1 Response,[2] Ex. 1 (Morales Dep. at 173:8 – 174:8, 175:10 – 175:16).

Dr. Joseph Morales is Chairman of NYMC's Department of Dental Medicine. 56.1 Statement ¶ 7, Ex. D (Morales Decl. ¶ 1). One of his responsibilities is to ensure the proper training and education of residents in the OMS residency program. Id. He is also Chief of the Dental Service at MET. 56.1 Statement ¶ 7, Ex. D (Morales Decl. ¶ 2).

In 2001, Dr. Morales recommended that NYMC hire Dr. Geldzahler to be the Program Director of the OMS residency program. 56.1 Statement ¶ 1, Ex. D (Morales Decl. ¶ 8). Dr. Geldzahler started at his position in June of that year, and his supervisor was Dr. Morales. Id., Ex. C; Geldzahler Decl. ¶ 12. Dr. Geldzahler's responsibilities as Program Director included formulating and executing a comprehensive didactic curriculum, setting goals and objectives for the program, maintaining program and resident statistics, maintaining an ongoing and systematic outcome assessment program, and other administrative functions. 56.1 Statement, Ex. B (Geldzahler Dep. at 35:22 – 36:19). He also practiced dental medicine at MET and WMC; as part of this role, he acted as an attending to supervise residents when they performed dental procedures. Id. (Geldzahler Dep. at 68:20 – 69:4.)

Over the years, Dr. Geldzahler and Dr. Morales had many disagreements about the OMS residency program. Dr. Geldzahler testified that, starting in 2001, he and Dr.

--------

[2] As mentioned in footnote 1, *supra*, Dr. Geldzahler has filed two Geldzahler Declarations in his opposition to the motion for summary judgment, both of which have attached exhibits. The Declaration at Docket Number 36 was filed with his 56.1 Response; this Declaration only attaches exhibits and does not contain any other sworn testimony. As a result, we will refer to this Declaration as the "56.1 Response" when citing to the attached exhibits. The other Declaration at Docket Number 40 will be referred to as the "Geldzahler Decl."

Morales disagreed over whether first-year residents should be in the Operating Room.
56.1 Statement, Ex. B (Geldzahler Dep. at 81:12 – 82:16).  And while Dr. Geldzahler
wished to spend more of his time working at WMC, Dr. Morales wanted him to spend at
least two days per week at MET.  56.1 Statement ¶ 40, Ex. D (Morales Decl. ¶12).  In
March 2005, Dr. Geldzahler requested a redistribution of his 35-hour-a-week
commitment to NYMC so that he would spend 30 hours at WMC and five hours at MET
every week instead of 25 hours at WMC and 10 hours at MET every week.  56.1
Statement ¶¶ 40-41, Exs. J & K; 56.1 Response, Ex. 2 (Geldzahler Dep. at 109:9 –
109:25).  Dr. Geldzahler believed that he was needed more at WMC for the benefit of the
residency program and wanted to balance his personal and professional life.  56.1
Statement, Ex. J.  He also believed that the OMS residency program was understaffed
when it came to attendings at MET, that he was already working too many hours, and that
NYMC needed to recruit additional attendings.  56.1 Statement, Ex. K.  Dr. Morales
believed it was in the best interests of MET, the residency program, and the Department
of Dental Medicine to deny this request.  56.1 Statement ¶ 42, Ex. D (Morales Decl. ¶
12).  Dr. Morales had asked Dr. Geldzahler on more than one occasion to spend at least
two days a week at MET rather than just one day a week.  Id.

Shortly thereafter, Dr. Geldzahler and Dr. Morales had a dispute regarding
disciplinary actions taken by Dr. Geldzahler against two residents in March and April
2005; they strongly disagreed regarding the procedures used by Dr. Geldzahler to
determine the disciplinary action and the actual discipline that he meted out.  56.1
Statement ¶ 43, Ex. L.

6

Dr. Geldzahler asserts that a major point of contention he had with Dr. Morales concerned the improper supervision of OMS residents at MET.  Dr. Geldzahler testified that while he was OMS Program Director, he complained verbally to Dr. Morales on numerous occasions that the large volume of patients the OMS residency program was handling at MET meant that residents were being improperly supervised or unsupervised by attendings at MET.  56.1 Statement, Ex. B (Geldzahler Dep. at 41:15 – 43:7; 73:14 – 74:2).  Dr. Geldzahler testified that he warned Dr. Morales that the improperly supervised OMS residents presented a danger to patients during unsupervised treatment and to the public when residents would later be expected to perform procedures for which they were ill-trained.  56.1 Statement, Ex. B (Geldzahler Dep. at 41:22 – 42:8, 82:4 – 82:16).

All residents in the OMS residency program must be subject to either general supervision or direct supervision by the attendings.  56.1 Response ¶ 46, Ex. 6 (Job Description with Specific Competencies for House Staff).  Dr. Geldzahler believed that much of the general and direct supervision provided by the attendings at MET was insufficient.  OMS residents work in the Dental Clinic and the Operating Room at MET, but these two areas are located on different floors.  Geldzahler Decl. ¶ 8; 56.1 Response, Ex. 1(Morales Dep. at 56:24 – 58:25).  All surgeries by OMS residents in the operating room were directly supervised by OMS attendings.  56.1 Response, Ex. 2 (Geldzahler Dep. at 218:21 – 219:16).  However, Dr. Geldzahler stated that there were "scores" of instances in which a first-year OMS resident would be performing procedures in the Dental Clinic and the OMS attending would be in the operating room, which was in another part of the hospital.  56.1 Response, Exs. 2 (Geldzahler Dep. at 44:10 – 46:11) & 3 (Goldsmith Dep. at 51:19 – 52:11, 57:11 – 57:21).  According to Dr. Geldzahler, the

7

OMS residents in the clinic often required direct supervision for the procedures they were performing, though he does not identify dates, cases, patients, or the residents involved when direct supervision by an OMS attending was lacking. 56.1 Statement ¶ 27, Ex. B (Geldzahler Dep. at 43:4 – 46:18, 55:6 – 56:18).

There was also no agreement as to what constitutes direct supervision. Dr. Goldsmith agreed with Dr. Geldzahler's definition of direct supervision as having an attending directly observe the procedure so that he or she can note if the resident is doing something improperly. 56.1 Response, Ex. 3 (Goldsmith Dep. at 76:9 – 76:19). Dr. Morales, however, testified that direct supervision means being immediately available to step in, such as having an attending who is in the Dental Clinic but not necessarily watching the resident perform the procedure. 56.1 Response, Ex. 1 (Morales Dep. at 171:4 – 172:7).

While there was normally a general practice attending available in the clinic to supervise the OMS resident, Dr. Geldzahler testified that general practice attendings lack the specialized training and certification of OMS surgeons and are, therefore, incapable of proper supervision. 56.1 Statement ¶ 27, Ex. B (Geldzahler Dep. at 44:10 – 46:11); Geldzahler Decl. ¶ 50. Even if general practice attendings could adequately provide direct supervision of OMS residents, Dr. Geldzahler testified that they too had to supervise three other general dental residents at the same time. 56.1 Response ¶ 23. Dr. Geldzahler also testified that there were even instances in which neither an OMS attending nor a general practice attending were available to provide direct supervision for an OMS resident. 56.1 Response, Ex. 2 (Geldzahler Dep. at 222:4 – 222:12). Dr. Goldsmith disputed the notion that there was inadequate supervision; he testified that

8

OMS residents working in the clinic would wait for the OMS attending to emerge from the operating room to provide direct supervision for any procedures for which the resident was not certified as competent. 56.1 Response, Ex. 3 (Goldsmith Dep. at 146:14 – 147:12).

The sheer volume of the clinic, according to Dr. Geldzahler, made it impossible for the attendings to supervise the residents properly. 56.1 Statement, Ex. B (Geldzahler Dep. at 43:4 – 46:18, 73:14 – 74:2). Dr. Geldzahler testified that OMS attendings like himself were often asked to sign stacks of patient charts to certify that the attending had supervised the procedures; in reality, the attendings either had not or had only provided general supervision of procedures performed by residents who were not competent. Geldzahler Decl. ¶ 75; 56.1 Response, Ex. 2 (Geldzahler Dep. at 55:17 – 56:5, 91:23 – 92:17). Dr. Goldsmith testified, however, that the clinic at MET was never so busy that the OMS attending could not see the patients briefly to check what the resident was doing. 56.1 Response, Ex. 3 (Goldsmith Dep. at 137:19 – 138:12).

Another undisputed and significant point of contention between Drs. Geldzahler and Morales concerned efforts to increase the number of patients in the dental clinic at MET and how those efforts did or did not conflict with the quality of the education that the OMS residents received. In August 2006, Dr. Morales was asked by Jose Sanchez of the New York City Health and Hospitals Corporation, which owns and operates MET, to create a business and strategic plan for the OMS division to increase the case mix, attract new patient referrals, and increase patient volume. 56.1 Statement ¶ 47, Ex. N. Dr. Morales, in turn, directed Dr. Geldzahler and others to make business and strategic plan proposals, specifying that he would not accept reducing the OMS clinical services or

9

residency at MET.  56.1 Statement ¶ 49, Exs. D (Morales Decl. ¶ 18) & N.  Dr. Morales believed that this arrangement would benefit the OMS residents by increasing the number of patients and, consequently, types of cases they would see in the Dental Clinic and by helping them to fulfill their clinic visits requirement under the CODA standards.  56.1 Statement ¶ 48, Exs. D (Morales Decl. ¶ 17) & N.  Dr. Geldzahler believed that this drive to increase the number of patients was financially motivated and made it difficult for attendings to properly supervise residents.  56.1 Response, Ex. 2 (Geldzahler Dep. at 50:8 – 50:18, 73:14 – 74:2, 250:21 – 251:10).  Dr. Geldzahler testified that Dr. Morales would post comparative figures on the number of operating room cases or procedures performed on the same month in the previous year on the Department's bulletin board to pressure residents and attendings to increase their case intake.  Geldzahler Decl. ¶ 79.

In October 2006, Dr. Morales sent a series of emails to, and held meetings with, Dr. Geldzahler to formulate a business and strategic plan for the OMS program at MET. On October 13, 2006, an email from Dr. Morales to Dr. Geldzahler referred to a memo Dr. Morales sent on October 7, 2006 about OMS resident assignments and asked for Dr. Geldzahler to respond with input from the OMS division leadership.  56.1 Statement ¶ 50, Exs. O & Q.  Dr. Geldzahler said he would send a proposal for a curriculum change on October 17, 2006 that would make the OMS division "as productive as possible without compromising resident education."  Id.  On October 17, 2006, he sent an email to Dr. Morales entitled "Response to Oct. 7, 2006 Memo" in which he stated that he met with Dr. Petti and Dr. Goldsmith, the Associate Directors at WMC and MET, respectively.  56.1 Response ¶ 52, Ex. 4.

Based on this meeting, Dr. Geldzahler proposed a curriculum change for the OMS residents, but stated that "[t]he consensus was that Metropolitan Hospital is in need of a change in focus: emphasizing quality of service to patients over quantity of patients seen" and later noted that the proposal "does not guarantee increased productivity over the present plan." Id. That same day, Dr. Geldzahler and Dr. Morales met to discuss the NYMC OMS resident program, which resulted in some strong differences in opinion, including disagreement over how residents' time should be structured. 56.1 Statement ¶¶ 54-56, Ex. P. Dr. Geldzahler testified that he did not remember whether they discussed the issue of public health or patient safety at that meeting. 56.1 Response, Ex. 2 (Geldzahler Dep. at 123:17 – 124:12). Dr. Geldzahler acknowledged afterwards that he had considerable disagreement with Dr. Morales regarding whether the OMS resident program's clinical and institutional service requirements were compromising resident education. 56.1 Statement ¶ 57, Exs. B (Geldzahler Dep. at 135:8 – 135:17), P & Q.

The tension in the relationship between Dr. Geldzahler and Dr. Morales became even more pronounced in the last few months of 2006. At an October 23, 2006 meeting, there was further disagreement over the OMS curriculum, and Dr. Morales told Dr. Geldzahler that he could be fired at will without cause. 56.1 Statement ¶¶ 59 & 60, Exs. D (Morales Decl. ¶ 26) & R. Dr. Geldzahler does not remember if he raised patient safety issues during this meeting. 56.1 Statement, Ex. B (Geldzahler Dep. at 123:17 – 124:12). Dr. Morales testified that he contemplated terminating Dr. Geldzahler at this time because it appeared that they no longer could cooperate with each other. 56.1 Statement ¶ 59, Ex. D (Morales Decl. ¶ 26).

11

A meeting between Drs. Geldzahler, Morales, and Goldsmith on November 22, 2006 focused on the dysfunctionality of the OMS resident program with respect to "power struggles," pitting education interest against clinical service, residents' bad attitudes, and using residents as pawns, among other things. 56.1 Statement ¶ 63, Ex. S; 56.1 Response, Ex. 2 (Geldzahler Dep. at 134:14 – 135:17). Dr. Geldzahler testified that he did not remember this meeting, and therefore, could not say whether he brought up the issue of patient or public safety. 56.1 Response, Ex. 2 (Geldzahler Dep. at 134:14 – 134:20).

In December 2006, Dr. Geldzahler wrote to Dr. Rosa Martinez, Chief of Dental Service at WMC, about his contentious relationship with Dr. Morales, the "constant battle and frustration" at MET, the continual pressure from Dr. Morales to increase his work hours at MET and reduce his work hours at WMC, and how these factors influenced him to consider resigning as OMS Program Director at NYMC. 56.1 Statement ¶ 64, Ex. T. In that same month, he resigned based on certain conditions, but when the conditions could not be met, he withdrew his resignation. 56.1 Statement, Ex. V. At around the same time, Dr. Morales drafted a list of 28 problems with Dr. Geldzahler's performance as the OMS residency Program Director, which included issues such as (1) not maintaining complete, organized, and centralized program records including all residents' patient care activity data as required by the ADA; (2) overly focusing on certain categories of OMS procedures where he can privately bill cases and limiting focus on other required categories of procedures; (3) disregarding certain clinic obligations of the OMS service and patient needs in MET's ambulatory walk-in area; (4) failing to demonstrate and maintain an ongoing and systematic outcome assessment

program; (5) minimizing or overlooking unprofessional resident behavior; and (6)
arriving late and leaving early on numerous occasions.  56.1 Statement ¶ 75, Ex. D ¶ 37;
56.1 Response, Ex. 7.  Dr. Geldzahler disputes that any of the items on this list were
actually problems.  56.1 Response ¶ 75, Exs. 2 (Geldzahler Dep. at 240:25 – 241:3) & 8.

      After Dr. Geldzahler ended up not resigning, he and Dr. Morales continued to
argue over the OMS residency program curriculum in January and February 2007.  As of
January 22, 2007, Dr. Geldzahler declared that he was restructuring the OMS residency
program's curriculum and service schedules for WMC and MET, a proposal that Dr.
Morales opposed.  56.1 Statement, Ex. V; 56.1 Response ¶ 69.  In January or February of
2007, Dr. Geldzahler told Dr. Morales that changes had to be made to the OMS residency
program or he would report the deficiencies to CODA; in particular, Dr. Geldzahler
wanted first-year residents in the operating room starting March 1, 2007.  56.1 Statement
¶¶ 69 & 70, Exs. B (Geldzahler Dep. at 92:24 – 96:14) & W; Geldzahler Decl. ¶ 85; 56.1
Response, Ex. 2 (Geldzahler Dep. at 101:14 – 102:5).  Dr. Morales responded to this
program change by stating that Dr. Gelzahler did not seem to have any goals or
objectives for the resident clinical assignment.  56.1 Statement, Ex. W.

      At a meeting on February 26, 2007, Dr. Morales informed Dr. Geldzahler that if
he would not resign, then he would be terminated, effective April 1, 2007.  56.1
Statement ¶ 76, Ex. D (Morales Decl. ¶¶ 38-39).

      Dr. Geldzahler made his first formal complaint to CODA on March 1, 2007.  56.1
Statement ¶ 78, Exs. B (Geldzahler Dep. at 25:2 – 25:4) & X.  In his complaint, Dr.
Geldzahler cited practices at MET that he alleged were in violation of certain CODA
Standards.  56.1 Statement, Ex. X.  To support his claim, Dr. Geldzahler stated in the

letter that "Dr. Morales is constantly walking the clinic floor and pushing the residents to increase numbers of patient visits" and that "[h]e continually posts O.R. statistics for residents to review, which indicates an interest in the quantity of cases and not the quality." In addition, Dr. Geldzahler also wrote that "[b]ecause the residents are driven so hard to increase production numbers, they have little time to spend with attendings . . . . The senior attendings, who spend the largest blocks of time at Metropolitan Hospital, have complained bitterly to me about the deterioration of conditions at that institution." 56.1 Statement ¶ 79, Ex. B (Geldzahler Dep. at 31:10 – 33:6).

On March 19, 2007, Dr. Morales sent Dr. Geldzahler a letter stating that, consistent with their conversation on February 26, 2007, he was terminated as the Program Director of the OMS residency program, effective April 1, 2007. 56.1 Statement ¶ 77, Exs. B (Geldzahler Dep. at 99:3 – 100:12) & E.

On March 26, 2007, CODA advised NYMC by letter of a formal complaint concerning the OMS Residency Program. 56.1 Statement ¶ 85, Ex. Z. CODA will also notify programs by phone about a complaint that has been filed against it before the program receives the letter in the mail. 56.1 Response, Ex. 3 (Goldsmith Dep. at 225:16 – 228:14). Here, CODA called Dr. Goldsmith before he received the written notice, but he was not told very much except that the complaint concerned orthognathics. Id. (Goldsmith Dep. at 228:15 – 229:15).

Following his termination as Program Director, Dr. Geldzahler continued to act as Chief of OMS at WMC and maintained privileges to practice dental medicine at MET

14

and WMC, where he remained as a voluntary faculty member with NYMC.[3]  56.1

Statement, Ex. B (Geldzahler Dep. at 136:23 – 137:18).  He was not paid a salary for

these positions.  56.1 Statement ¶ 98, Ex. B (Geldzahler Dep. at 142:2 – 142:4, 172:6 –

173:2).  Instead, he earned income through billing for services on his private cases at both

facilities.  56.1 Statement ¶¶ 5 & 82; 56.1 Response, Ex. 2 (Geldzahler Dep. at 179:20 –

179:23).

On April 17, 2007, Dr. Geldzahler filed a second complaint with CODA about the

legitimacy of NYMC's online resident evaluation system.  56.1 Statement ¶¶ 86 – 87, Ex.

AA.

Dr. Geldzahler subsequently engaged the services of a lawyer to send a series of

letters between March 30, 2007 and April 15, 2008 to various high-level personnel at

NYMC and MET, including Dr. Morales, Waldemar Comas (NYMC's General Counsel),

Jose Sanchez (Senior Vice President with the New York City Health and Hospitals

Corporation, which owns and operates MET), Dr. Ralph O'Connell (Dean of NYMC),

Dr. Richard McCarrick (Dean of NYMC), and Dr. Karl Adler (President and CEO of

NYMC).  Geldzahler Decl. ¶ 3, Ex. 2.  In these letters, Dr.   Geldzahler alleged that he

was unlawfully terminated as the OMS resident program director, and in some of the

letters, he alleged that his termination was a retaliatory discharge in violation of the New

York Whistleblower Statutes.  Id.  The May 30, 2007 letter to Waldemar Comas, for

example, stated that Dr. Geldzahler frequently warned Dr. Morales about the practice of

pressuring residents to approve emergency or ambulatory surgical procedures for patients

---

[3] Dr. Geldzahler chose not to renew his faculty teaching position at MET in June
2007. 56.1 Response, Ex. 2 (Geldzahler Dep. at 139:3 – 139:8).

who did not need them. Id. Dr. Geldzahler alleged that Dr. Morales pushed this practice

to improve MET's financial health. Id. The letters do not mention the lack of

supervision by attendings of residents. Id.

On February 8, 2008, CODA sent a letter to NYMC regarding its investigation

into Dr. Geldzahler's March, 2007 complaint. 56.1 Statement ¶ 88, Ex. BB. It notified

NYMC of its resolution to grant the program the accreditation status of "approval with

reporting requirements" to demonstrate NYMC's compliance with Standards 1-5, 2, and

4-7.[4] Id.

Dr. Jay Goldsmith, who had been the Associate Program Director of the OMS

program and Chief of OMS at MET, was hired as Program Director of the OMS

residency program in March 2008. 56.1 Statement ¶¶ 8 & 91, Ex. F (Goldsmith Dep. at

26:5 – 26:14, 58:12 – 58:22). Based on his experience with Dr. Geldzahler in preparing

for a regular accreditation site visit by CODA on October 10, 2008, Dr. Goldsmith came

to believe that Dr. Geldzahler was not acting in the best interest of the OMS residency

program or its residents. 56.1 Statement ¶ 96, Ex. F (Goldsmith Dep. at 186:25 – 189:12,

186:1 – 186:24). Dr. Goldsmith had informed the faculty of the Department of Dental

Medicine, which included Dr. Geldzahler, of the upcoming visit and requested that they

send him orthognathic[5] cases for CODA's inspection to determine compliance with ADA

---

[4] The letter also added that NYMC's OMS program submitted falsified
documentation relating to student/resident attendance at weekly conferences. Because
this violated CODA's policy on integrity, CODA notified NYMC of its intent to
withdraw the program's accreditation unless NMYC could demonstrate sufficient
progress towards achieving compliance with CODA's "Principles of Integrity."

[5] According to the Mayo Clinic website, orthognathic surgery is a combination of
jaw surgery and orthodontics. Mayo Clinic, "Jaw Surgery,"
http://www.mayoclinic.org/jaw-surgery/ (last visited Sept. 29, 2010).

certification standards. 56.1 Statement ¶ 92, Ex. F (Goldsmith Dep. at 158:10 – 159:6).

On October 3, 2008, when Dr. Goldsmith asked Dr. Geldzahler for documentation of his

orthognathic cases, Dr. Geldzahler responded by requesting that Waldemar Comas,

NYMC's General Counsel, contact Dr. Geldzahler's attorney. 56.1 Statement ¶ 93, Ex.

DD. Dr. Geldzahler stated that this was an attempt to get someone at NYMC to speak

with his lawyer about his possible improper termination claim and had nothing to do with

the orthognathic cases. 56.1 Response ¶ 93. Four days later, Dr. Geldzahler requested

that Dr. Goldsmith remove his 20 private orthognathic cases from what would be

provided for CODA's site visit. 56.1 Statement ¶ 94, Ex. EE. Dr. Geldzahler did not

believe that these cases were compliant with CODA Standard 4-11, which states that a

resident will be considered the resident surgeon only when the program has documented

that he or she has played a significant role in the diagnosis, the pre-operative care, the

operative procedure, the post-operative course, and any other patient follow-up. 56.1

Statement ¶ 95, Ex. FF. It was not until the day before, and the morning of, the CODA

site visit, that Dr. Geldzahler advised Dr. Goldsmith as to which of his orthognathic cases

were compliant with Standard 4-11 and how the other orthognathic cases could be

brought into compliance. 56.1 Statement ¶ 95, Exs. FF & GG.

On October 30, 2008, Dr. Goldsmith received a request from Dr. Morales to

either recommend or not recommend existing OMS faculty members for reappointment

as part of NYMC's two-year reappointment cycle. 56.1 Statement ¶ 97, Ex. HH. On

November 3, 2008, Dr. Goldsmith recommended that Dr. Geldzahler not be reappointed

to the faculty because, based on his experience in preparing for the CODA site visit, Dr.

Goldsmith believed that Dr. Geldzahler was trying "to derail and to sabotage [the OMS

17

residency] training program."   56.1 Statement ¶¶ 99 – 100, Ex. II; 56.1 Response, Ex. 3

(Goldsmith Dep. at 182:13 – 190:5, 246:16 – 247:18).

      Dr. Geldzahler filed a third complaint with CODA on December 12, 2008,

alleging that some of the orthognathic cases used by the NYMC OMS residency program

during the October site visit were not compliant with CODA Standard 4-11, and,

therefore, NYMC did not generate enough orthognathic surgery cases for its residents.

56.1 Statement ¶ 101, Ex. JJ.  CODA informed Dr. Goldsmith that a third complaint had

been filed, which he found to be "strikingly similar" to the concerns that Dr. Geldzahler

had expressed before, though he had not been told by CODA or anyone else who filed the

complaint.  56.1 Statement ¶¶ 102 – 103, Ex. F (Goldsmith Dep. at 231:2 – 233:23).

      In January 2009, NYMC informed Dr. Geldzahler that his faculty appointment

had not been renewed.  56.1 Statement ¶ 103, Ex. B (Geldzahler Dep. at 171:20 – 172:5).

On February 13, 2009, Dr. Goldsmith directed Dr. Petti, the Associate Program Director

and Site Director at WMC, to remove Dr. Geldzahler from all schedules that involved

resident supervision or education.   Geldzahler Decl. ¶ 7, Ex. 4.  Dr. Geldzahler claims

that his removal from all resident supervision or education destroyed his private OMS

practice at WMC because residents could no longer assist him in operations, and he no

longer had access to new patients.  Geldzahler Decl. ¶ 7; 56.1 Response, Ex. 2

(Geldzahler Dep. at 178:8 – 179:19, 181:24 – 182:11).

      On February 25, 2009, Dr. Geldzahler filed the instant action.  56.1 Statement ¶

105, Ex. A.

## III.    DISCUSSION

The remaining causes of action in this case come under two provisions of New York's Whistleblower Statutes.  Section 740 of New York's Labor Law, enacted in 1984, is the general Whistleblower Statute; it encompasses any employee who has suffered a retaliatory personnel action as a result of reporting or threatening to report an illegal activity by the employer which constitutes a "substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2).  In 2002, the New York State legislature enacted an additional Whistleblower Statute, which is codified as Section 741 of New York Labor Law, specifically intended to cover health care professionals. N.Y. Lab. Law § 741.

### A.    Summary Judgment Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a summary judgment motion, the Court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citing Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986)).

As Dr. Geldzahler is a pro se plaintiff, this Court will "read [his] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (citation omitted).  Dr. Geldzahler's pro se status, however, does not relieve him from the usual requirements of summary judgment. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003); Fitzpatrick v. New York Cornell Hosp., No. 00 Civ. 8594 (LAP), 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003).  Those requirements include the obligation not to rest upon mere

19

conclusory allegations or demands, but instead to set forth "concrete particulars" showing

that a trial is needed.  R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.

1984).

> **B.**     **The Claims Under Section 740 Are Either Time-Barred or Precluded Because Dr. Geldzahler Does Not Meet the Statutory Definition of an Employee**

Dr. Geldzahler asserts that defendants took two different adverse actions against

him.  On April 1, 2007, he was terminated from his position as Program Director at

NYMC.  56.1 Statement ¶ 4, Exs. B & E.  More than a year later, on November 3, 2008,

his faculty appointment at NYMC was not renewed upon the recommendation of Dr.

Goldsmith.  56.1 Statement ¶ 99, Exs. II & F.  As a result, Dr. Goldsmith directed Dr.

Petti, the Associate Program Director and Site Director at WMC, to remove Dr.

Geldzahler from all schedules that involved resident supervision or education by

February 13, 2009.   Geldzahler Decl. ¶ 7, Ex. 4.

Dr. Geldzahler's claim under Section 740 based on the April 1, 2007 termination

is time-barred.  The statute of limitations for bringing an action under Section 740 is "one

year after the alleged retaliatory action was taken."  N.Y. Lab. Law § 740(4)(a).  Dr.

Geldzahler filed the present action on February 25, 2009, more than a year after he was

terminated as the Program Director of NYMC.

While the Section 740 claim vis-à-vis Dr. Geldzahler's faculty appointment is not

time-barred, it is not cognizable because he was not an employee at the time his faculty

appointment was not renewed.  The statute only applies to an individual who works

"under the control and direction of an employer for wages or other remuneration" as an

employee.  N.Y. Lab. Law § 740(1)(a) (emphasis added).  Dr. Geldzahler's termination

as the Program Director for NYMC meant that he was no longer a full-time salaried

employee.  56.1 Statement ¶ 98, Ex. B (Geldzahler Dep. at 142:2 – 142:4, 172:6 – 173:2).
He continued to teach at NYMC as a voluntary, non-salaried attending.  Id.  And while he
still retained privileges to practice at WMC and MET (the latter of which he voluntarily
declined to renew in June 2007), he only earned income through billing for services on
his private cases at both facilities and not from NYMC.  56.1 Statement ¶¶ 5 & 82; 56.1
Response, Ex. 2 (Geldzahler Dep. at 179:20 – 179:23).  He was therefore not an
employee as defined by Section 740 when Defendants failed to renew his faculty position
and removed him from all resident supervision and education.  Rotwein v. Sunharbor
Manor Residential Health Care Facility, 181 Misc. 2d 847, 851, 695 N.Y.S.2d 477, 481-
82 (N.Y. Sup. Ct. 1999) (attending podiatrist who billed patients directly for services not
considered employee under Section 740).  For these reasons, Defendants' motion for
summary judgment on Dr. Geldzahler's Section 740 claims is granted.[6]

### C.      The Claims Under Section 741

Section 741 was enacted in 2002 as a Whistleblower Statute designed particularly
for health care employees, but enforcement of a claim under Section 741 must be sought
through Section 740(4)(d).  N.Y. Lab. Law § 741(4).  The protection afforded by Section
741 is as follows:

> [N]o employer shall take retaliatory action against any
> employee because the employee does any of the following:

---

[6] Magistrate Judge Peck rejected defendants' statute of limitations arguments in
resolving the motion to dismiss.  In doing so, however, he did not differentiate between
the two adverse actions, focusing entirely on the second one (which did not occur until
November, 2008).  Geldzahler, 663 F. Supp. 2d at 390.  Nothing in his decision precludes
the finding that the challenge to the first personnel action, which took place in April,
2007, is time-barred.  As to the decision not to renew Plaintiff's faculty appointment,
Judge Peck does not address the statutory definition of "employee," or make any findings
on that issue.  Therefore, the law of the case doctrine (which is discretionary in any
event) is not implicated here.

> (a) discloses or threatens to disclose to a supervisor, or to a
> public body an activity, policy or practice of the employer
> or agent that the employee, in good faith, reasonably
> believes constitutes improper quality of patient care; or (b)
> objects to, or refuses to participate in an activity, policy or
> practice of the employer or agent that the employee, in
> good faith, reasonably believes constitutes improper quality
> of patient care.

N.Y. Lab. Law § 741(2).  Though it has been eight years since it was enacted, there is

little case law interpreting Section 741.  To the extent that there is any jurisprudence that

analyzes language that is similar in Section 740, we will refer to these cases for guidance.

N.Y. Stat. § 222 cmt. ("It is a general rule of statutory construction that earlier statutes

are properly considered as illuminating the intent of the Legislature in passing later acts,

especially where there is doubts as to how the later act should be construed, since when

enacting a statute the Legislature is presumed to act with deliberation and with

knowledge of the existing statutes on the same subject."); Reddington v. Staten Island

Univ. Hosp., 511 F.3d 126, 135 (2d Cir. 2007) (New York statutory construction rules

require equivalent construction of terms in statutes on same subject matter).

> 1.    **The Section 741 Claim Is Dismissed as to Dr. Goldsmith**
>       **Because Dr. Geldzahler Does Not Meet the Statutory**
>       **Definition of an "Employee"**

Like Section 740, Section 741 also offers protection to employees against

retaliatory action by their employers.[7]  The definition of "employee" is slightly different

between the two statutes.  An "employee" under Section 741 is "any person who

_____

[7] Unlike the one year statute of limitations in Section 740, the statute of
limitations for a claim under Section 741 runs for two years after the alleged retaliatory
personnel action was taken. N.Y. Labor Law § 740(4)(d).  Both adverse personnel
actions taken by Defendants against Dr. Geldzahler fall within this time period.

performs health care services for and under the control and direction of any public or

private employer which provides health care services <u>for wages or other remuneration</u>."

N.Y. Lab. Law § 741(1)(a) (emphasis added).  As determined above, Dr. Geldzahler was

no longer an employee after April 1, 2007 because he no longer received a salary from

NYMC.  Therefore, the Court will not consider any of the events which occurred after

this date for purposes of Dr. Geldzahler's Section 741 claim.  The adverse personnel

actions for which Dr. Goldsmith is responsible include when, in his capacity as the new

OMS Program Director, he declined to recommend Dr. Geldzahler for a faculty position

at NYMC in November 2008 and directed Dr. Petti to remove Dr. Geldzahler from any

resident supervision or education by February 2009.  Accordingly, because they arise out

of events occurring after Dr. Geldzahler was no longer an "employee" under Section 741,

the remaining claim against Dr. Goldsmith must be dismissed.

> **2.      The Section 741 Claim Is Dismissed as to Dr. Morales Because
> He Does Not Meet the Statutory Definition of an "Employer"**

Section 741 defines an employer as any "partnership, association, corporation, the

state, or any political subdivision of the state" that provides health care services.  N.Y.

Lab. Law § 741(1)(b).  While this definition is clearly applicable to NYMC, it is not

applicable to Dr. Morales.

The Court is aware of only one case that has interpreted the definition of

"employer" under Section 741.  In <u>Sulieman v. Roswell Park Cancer Institute</u>, the court

concluded that the definition should be read to include individuals as well, contrary to the

plain language of the statute.  No. 05 CV 766S, 2008 WL 2690278, at *15 (W.D.N.Y.

June 30, 2008) (citing N.Y. Lab. Law § 741(4)).  The court observed that Section 741

specifically excludes individuals from the definition of an employer, but because

23

enforcement of Section 741 claims must be sought under Section 740, it determined that the two statutory sections should be construed in tandem.

Section 740 states that "a health care employee who has been the subject of a retaliatory action by a health care employer in violation of section seven hundred forty-one of this article may institute a civil action in a court of competent jurisdiction for relief . . . " N.Y. Lab. Law § 740(4)(d).  Section 740's definition of an "employer" includes a "person."  Id. § 740(1)(b).  The conflicting statutory definitions of "employer" led the Sulieman court to consider extrinsic material to determine the correct definition under Section 741.  Sulieman, 2008 WL 2690278, at *15 (citing N.Y. Stat. § 111; Reddington, 511 F.3d at 135 (New York statutory construction rules require equivalent construction of terms in statutes on same subject matter)).

Based on the legislative history of Section 741, the court concluded that the New York Legislature intended for Section 741 to "expand[] the definition of employer to include employer's agents" and to protect "against retaliation by employers or supervisors."  Id. (citing N.Y. Legis. Serv. Governor's Bill Jacket, 2002 A.B. 9454, ch. 24; Memorandum to James M. McGuire, Counsel to the Governor, from Dennis P. Whalen, Executive Deputy Commissioner of New York Department of Health).  As a result, the Sulieman court held that the defendant doctor could be sued in his individual capacity under Section 741.  Id.  It concluded that the defendant doctor was an agent of the health care facility at which the plaintiff worked and was effectively the plaintiff's employer: as her supervisor, he had the power to hire, fire, and administer the funding of the plaintiff's fellowship program.  Id.

24

The Court disagrees with the analysis in Sulieman regarding the definition of "employer." New York law requires statutes to be construed with reference to earlier statutes. N.Y. Stat. § 222. The Legislature presumably acted "with deliberation and with knowledge of the existing statutes on the same subject" and crafted Section 741 so that it would not be a carbon copy of Section 740. N.Y. Stat. § 222 cmt. Much of the language contained in Section 741 mirrors what is contained in Section 740; we must therefore assume that the differences between the two statutory provisions were deliberate. N.Y. Stat. § 230 cmt. ("It is fundamental that the words used should be given the meaning intended by the lawmakers, and words will not be expanded so as to enlarge their meaning to something which the Legislature could easily have expressed but did not."). The New York Court of Appeals, in determining the definition of the word "employee" under Section 741, noted that Section 741 had "an exactingly specific definition" of the word compared to Section 740. Reddington v. Staten Island Univ. Hosp., 11 N.Y.3d 80, 91, 893 N.E.2d 120, 127 (2008).[8] As a result, the court held that "the universe of covered employees [under Section 741] must be smaller than all those . . . who are afforded the more generalized protection of Section 740." Id. Similarly, Section 741 has a more specific definition of "employer" than Section 740, and it is necessary to take that difference into account, notwithstanding the fact that Section 741 is enforced under Section 740.

Even if the legislative history provides that the statute "expands the definition of employer to include employer's agents," as the Sulieman court observed, the word

---

[8] The New York Court of Appeals decided Reddington one day after the decision in Sulieman was issued, so the Sulieman court did not have the benefit of the Court of Appeals' analysis.

"agent" only appears in Section 741 to refer to the entity (the employer or the agent) whose activity, policy, or practice the employee reasonably believes constitutes improper quality of patient care. N.Y. Lab. Law § 741(2)(a) and (b) (retaliatory action prohibited if the employee discloses, threatens to disclose, objects to, or refuses to participate in "any activity, policy or practice of the employer or agent"). The clause prohibiting retaliatory action under Section 741, however, is directed only at the employer. N.Y. Lab. Law § 741(2) ("no employer shall take retaliatory action against any employee . . ."); see also N.Y. Stat. § 240 cmt. ("It is a universal principle in the interpretation of statutes that . . . the specific mention of one person or thing implies the exclusion of other persons or things."). Because the prohibition against retaliatory action in Section 741 is not directed at the employer's agents, Dr. Geldzahler's claim against Dr. Morales must be dismissed.[9]

Nonetheless, NYMC may still be held liable under Section 741 for Dr. Morales' actions as Dr. Morales is clearly its agent. N.Y. Lab. Law § 741(c) ("'Agent' means any individual . . . acting on behalf of an employer."). We turn to the question of NYMC's liability below.

### 3.  Summary Judgment Should Be Granted on the Section 741 Claim Against NYMC Based on Its Uncontroverted Defense That It Had Reasons Unrelated to Whistleblowing for Discharging Dr. Geldzahler

Section 741 provides the employer with a defense if "the personnel action was predicated upon grounds other than the employee's exercise of any rights protected by this section." N.Y. Lab. Law § 741(5). For example, in Luiso v. Northern Westchester

---

[9] Even if there is individual liability under Section 741, the claim against Dr. Morales must still be dismissed based on the uncontroverted defense discussed in Section III.C.3 infra.

Hosp. Center, the defendant obtained summary judgment dismissing a Section 741 claim because it was able to establish that the plaintiff had been transferred out of her management position in the operating room based on her work performance. 65 A.D.3d 1296, 886 N.Y.S.2d 216 (2d Dep't 2009). Similarly, the defendant in Timberlake v. New York Presbyterian Hospital prevailed on its motion for summary judgment on the plaintiff's 741 claim after offering "ample evidence" that the plaintiff's reprimand and termination were based on her insubordination and deficient performance. No. 05 Civ. 5616 (LAP), 2009 WL 3122580, at *6 (S.D.N.Y. Sept. 20, 2009).

In this case, there is no dispute in the record that the tense relationship between Dr. Geldzahler and his supervisor, Dr. Morales, was the reason that Dr. Morales chose to terminate Dr. Geldzahler from his position as program director and to remove him from his other positions. 56.1 Statement ¶ 72, Ex. D (Morales Decl. ¶ 38). Much of the tension stemmed from disagreements about the quality of education and training received by OMS residents.

Dr. Geldzahler contends that the disagreements and the resulting tension were caused by his complaining about the improper supervision of residents. However, the timing as to when he made his complaints and when he was terminated does not support an inference that his termination was a retaliatory action. In Dougherty v. Memorial Sloan-Kettering Cancer Center, No. 00 Civ. 4083 (JGK), 2002 WL 1610916, at *7-8 (S.D.N.Y. July 22, 2002), the court granted summary judgment and dismissed a Section 740 claim because there was no evidence of retaliation by the employer when the plaintiff had been making the same complaints for 21 years but had not been terminated until she made two serious errors within a month of her termination. Much like the plaintiff in

27

Dougherty, Dr. Geldzahler testified that he had been complaining about the danger of unsupervised first-year residents to Dr. Morales since 2001, though his dismissal did not occur until 2007. Geldzahler Dep. at 81:12 – 82:23.

Moreover, by the time Dr. Geldzahler threatened to report his concerns to CODA and by the time Dr. Morales requested Dr. Geldzahler's resignation, there were already other significant disagreements contributing to the problems in their relationship that had been building over the years. It is undisputed that, in as early as 2001, there were strong differences in opinion between Dr. Geldzahler and Dr. Morales regarding whether first-year residents should be in the operating room, a disagreement which continued through February 2007. Geldzahler Dep. at 81:12 – 82:16; 56.1 Statement, Ex. W. From March 2005 to at least December 2006, the two doctors argued over how Dr. Geldzahler should divide his work schedule between MET and WMC and how he disciplined residents. 56.1 Statement ¶¶ 40-43, Exs. J-L & T. A meeting about developing a business and strategic plan for the OMS residency program at MET between Dr. Geldzahler and Dr. Morales on October 17, 2006 resulted in conflict, which included disagreement over how residents' time should be structured. 56.1 Statement, Ex. P. On November 22, 2006, Dr. Morales, Dr. Geldzahler, and Dr. Goldsmith met to discuss different problems with the OMS residency program, one of which was the power struggles that pitted educational interest against clinical service. 56.1 Statement, Ex. S, Geldzahler Dep. at 134:14 – 135:17.

Dr. Morales had even discussed with Dr. Geldzahler the possibility of his either being terminated or resigning as Program Director before he was actually terminated. The evidence in the record demonstrates that the reasons for these discussions were

disagreements about the OMS residency program curriculum, Dr. Geldzahler's work schedule, and the troubled relationship between Dr. Geldzahler and Dr. Morales.  In discussing curriculum changes on October 23, 2006, for example, Dr. Morales told Dr. Geldzahler that he could be fired at will and without cause.  56.1 Statement, Ex. R.  In December 2006, Dr. Geldzahler had resigned as Program Director based on certain conditions, but when they could not be fulfilled, he withdrew his resignation.  56.1 Statement, Ex. U.  On December 13, 2006, Dr. Geldzahler confirmed in an email that he had wanted to resign because he and Dr. Morales got along like "oil and water," he experienced constant battling and frustration at MET, and he was continually pressured by Dr. Morales to increase his work hours at MET and reduce his work hours at WMC. 56.1 Statement, Ex. T.

Right before Dr. Morales asked for Dr. Geldzahler's resignation on February 26, 2007, there were arguments over the OMS residency program curriculum.  Dr. Geldzahler declared on January 22, 2007 that he was restructuring the OMS residency program's curriculum and service schedules between WMC and MET, a proposal that Dr. Morales opposed.  56.1 Statement, Ex. V.  Dr. Geldzahler then announced on February 1, 2007 that he wanted to have first-year OMS residents in the operating room, which prompted Dr. Morales to respond that Dr. Geldzahler did not seem to have any goals or objectives for the resident clinical assignment.  56.1 Statement, Ex. W.

By the time Dr. Geldzahler told Dr. Morales that either the OMS residency program had to change by March 1, 2007 or he would report alleged violations to CODA, it was January or February 2007.  56.1 Statement ¶¶ 69-70; Geldzahler Dep. at 92:24 – 96:14, 101:14 – 102:5.  Dr. Geldzahler testified that he could not remember if he had

raised patient or public safety issues at this meeting or the October 23 or November 22 meetings; at most, he testified, these issues were implied. Geldzahler Dep. at 92:24 – 96:14, 103:17 – 105:2, 123:17 – 124:12, 134:14 – 134:20. Dr. Morales informed Dr. Geldzahler on Feburary 26, 2007 that he would either have to resign or be terminated, effective April 1, 2007. 56.1 Statement ¶ 76, Ex. E.

The undisputed evidence shows that Dr. Morales' decision to terminate Dr. Geldzahler involved their inability to get along and disagreements about resident education. Dr. Geldzahler had complained about the danger to patients and public safety due to unsupervised OMS residents for years without adverse consequences. Therefore, his termination cannot be considered a retaliatory action protected by Section 741. Granting summary judgment on Dr. Geldzahler's Section 741 claim as against NYMC is therefore appropriate.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 31) is GRANTED. The Clerk of the Court is directed to enter judgment for Defendants and close this case.

**SO ORDERED.**

Dated: New York, New York
      September 30, 2010

                         JAMES L. COTT
                         United States Magistrate Judge

**Copies of this Opinion and Order have been sent by mail to the following:**

Gerald Geldzahler
16 Notch Hill Drive
Livingston, NJ 07039

30

Barbara E. Hoey
Christopher John Collins
Kevin James Smith
Kelley Drye & Warren, LLP
101 Park Avenue
New York, NY 10178